**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**JUSTIN JAMES AKA HURRICANE**                                    **PETITIONER**

**v.**                                                        **NO. 4:17-CV-129-DMB-JMV**

**STATE OF MISSISSIPPI**                                          **RESPONDENT**

---

**REPORT AND RECOMMENDATION**

---

      This matter is before the court on the First Amended Petition for a Writ of *Habeas Corpus* filed by Justin "Hurricane" James, a state prisoner proceeding with the assistance of counsel, to set aside his 2008 convictions arising from the armed robbery of the Hills Brothers Logging Shop. Petitioner is serving a (60) sixty-year sentence for these convictions. He alleges as violations of his federal constitutional rights two instances of improper refusal of jury instructions, denial of his motion for new trial based on juror misconduct, and erroneous denial of post-conviction collateral relief based upon recanted testimony of an accomplice.

      Each of Petitioner's claims were considered on the merits by the Mississippi Court of Appeals on both direct appeal and post-conviction collateral review and were DENIED. Upon review of the record, the parties' arguments, and controlling legal authority, for the reasons discussed below, the undersigned recommends that the petition be DENIED.

      Specifically, the undersigned recommends that the Petitioner's request for an evidentiary hearing be DENIED, the Petitioner's request for issuance of a writ of *habeas corpus* under 28 U.S.C. § 2254 be DENIED, and the petition DISMISSED with prejudice.

1

### *Factual Background*

The following are the pertinent facts found by the Mississippi Court of Appeals:

¶ 2. On November 14, 2008, a robbery occurred at the Hill Brothers Logging Shop (Logging Shop) in Kosciusko, Mississippi, where several people had gathered to play cards, drink beer, and socialize. Upon hearing a knock at the door around 11 p.m., Jimmy Cook (Cook) went to the door and asked who was outside, but no one answered. Around the same time, Keith Holt (Holt) parked his truck outside the Logging Shop and witnessed four masked men with guns run away from the Logging Shop's front door. Holt saw the men hide behind a nearby truck.

¶ 3. Ricky Hill (Ricky) and Jim Hill (Jim) exited the Logging Shop to see who was outside. Holt relayed what he had seen to Ricky, and Ricky walked toward the truck where the men had hidden. As Ricky made his way to the truck, one of the masked men pointed a gun at Ricky's face and instructed him to drop to his knees and crawl back into the Logging Shop. Another masked man chased Jim into the Logging Shop. Several shots were fired into the Logging Shop, and the masked men demanded money from the people inside the Logging Shop. The gunfire resulted in injuries to Cook and Donnie Elmore (Elmore) and in the death of Jessie Earl Hill (Jessie). During the robbery, one robber's mask slipped, revealing the man's face. Ricky identified the man as Barry Love (Love).

¶ 4. Following his arrest, Love admitted his involvement in the robbery and identified James, Roberson, and Robert Landfair (Landfair) as his fellow conspirators. The police arrested all three men, and James and Roberson, Defendants in this appeal, were jointly indicted and tried. Prior to Defendants' trial, Landfair pleaded guilty. Two months after Defendants' trial, Love was tried and convicted.

…

¶ 6. Defendants' trial began on September 20, 2010. In addition to the testimony of several eyewitnesses who were at the Logging Shop on the night of the robbery, the State called Love to testify against Defendants. Love testified that Roberson called him the day of the shooting to enlist him in a plan to get money back from a person with whom Roberson had previously had an altercation. Roberson told Love that the person would be at the Logging Shop on the night in question. Around 9:30 p.m. or 10 p.m. that night, Roberson, James, and Landfair picked Love up in a white Cadillac driven by James, and the men proceeded to the Logging Shop.

¶ 7. According to Love's testimony, James parked the white Cadillac on a dirt road near the Logging Shop, and the four men concealed their faces and grabbed firearms from the car trunk. The men then made their way to the Logging Shop, and James called Jimmy Fletcher (Fletcher), who was inside the Logging Shop. Love testified that James asked Fletcher whether any guns were inside the Logging Shop, and Fletcher responded that no guns were inside the building. Roberson then knocked on the locked front door. A voice from within the Logging Shop asked

2

who was outside, but none of the men answered. At this point Holt pulled into the parking lot, and the four men hid.

¶ 8. Love testified that James was the robber who pointed his gun at Ricky's head and forced Ricky to crawl back into the Logging Shop. Love further testified that James, Roberson, and Landfair all fired shots into the building but that he (Love) neither fired shots nor stepped fully through the building's doorway. Following the shooting, Love claimed that Landfair fled on foot while the other three men made their way back to the Cadillac. When Love returned home, his mother informed him that the police were looking for him. Love called the police and then went to the sheriff's department the next morning. He provided the police with a statement identifying himself, James, Roberson, and Landfair as the men involved in the robbery.

¶ 9. During the trial, Defendants' attorneys impeached Love on the following points: (1) which gun Love carried with him to the Logging Shop; (2) where Love stood during the shooting; and (3) whether Love fired any shots into the building during the robbery. In a prior statement signed by Love, he stated that he had a 9–millimeter handgun with him during the robbery. A second signed statement to police said that Love carried a 12–gauge shotgun with him and fired into the Logging Shop three times. At trial, however, Love testified that he chose a .40–caliber handgun from the weapons in the car trunk and that he never fired shots into the Logging Shop.

¶ 10. Other witness testimony differed from Love's as to which of the four shooters actually stood in the door and fired the first shots. According to Love's testimony at trial, he never fired shots into the building and, at most, had one foot inside the building's doorway. Ricky testified, however, that as he crawled back to the Logging Shop, he saw Love step into the building and fire three or four shots inside. Ricky further testified that Love appeared to be holding a shotgun or a rifle.

¶ 11. Despite the discrepancies between Love's testimony at trial and his prior statements, as well as between Love's testimony and that of other witnesses, the State argues in its brief that Love consistently maintained that he, James, Roberson, and Landfair committed the robbery. The State further argues that other evidence presented at trial substantially corroborated Love's testimony. Both Holt and Regina Hill Coates (Regina), a daughter of the deceased victim, Jessie, testified that they saw a white Cadillac parked near the Logging Shop before the shooting. Regina stated that she saw a white Cadillac parked on a nearby road as she drove to the Logging Shop the night of the robbery and that she saw four heads in the parked car. Police also recovered an unspent 9–millimeter round when they searched James's car, a white Cadillac. In both his signed statements to police and his trial testimony, Love consistently maintained that Roberson carried a Tec–9 handgun the night of the robbery. Although no 9–millimeter rounds were found at the Logging Shop, the State asserts that the discovery of the unspent round in James's car "corroborates Love's assertion that Roberson was armed with a Tec–9, which uses 9[-millimeter] ammunition."

3

¶ 12. The State also argues that the subpoenaed phone records of the four men supports Love's testimony. According to Love's testimony, Roberson called him when he, James, and Landfair arrived outside Love's house to pick Love up. The State contends that this was likely the phone call made from Roberson's phone to Love's phone at 10:17 p.m. The State also argues that a call made from James's phone at 10:52 p.m., about ten minutes before the shooting, was likely the call made to Fletcher to see whether anyone inside the Logging Shop had a gun.

¶ 13. Love also testified that Landfair escaped on foot after the shooting while the other three men returned to the car. The subpoenaed phone records reflect that between 11:02 p.m. and 12:22 a.m. Roberson made fourteen calls to Landfair's cell phone. Love further testified that he and James dropped Roberson off so that Roberson could get his mother's vehicle. Then Love and James dropped off James's vehicle, set out on foot, and met Roberson in front of a club. The State asserts that this part of Love's testimony is also corroborated by the phone records, which show that James and Roberson called each other five times between 12:22 a.m. and 12:42 a.m.

¶ 14. At Defendants' trial, Roberson and two of his friends testified that Roberson was at a bar when the shooting occurred. While on the witness stand, Roberson further claimed that he did not have his cell phone the night of the shooting. Despite the phone records showing that he called Love's phone seven times before the shooting, Roberson also testified that he and Love had a bad history and that it would have been unusual for him to contact Love.

¶ 15. Another witness at Defendants' trial, Keshia Windom (Windom), testified and provided an alibi for James. James is the father of one of Windom's children, who was three months old at the time of the shooting. Windom testified that James came to see his three-month-old baby at 10 p.m. the night of the shooting and stayed until 11:30 p.m. However, in a statement made by Love to the police, which Defendants offered into evidence, Love said that James called Windom before the shooting and "said if anything went down for her to say she was with him."

¶ 16. After hearing the testimony and considering the evidence presented, a jury found James and Roberson guilty of all five counts charged in their indictment… The trial judge ordered Roberson to serve a term of twenty years in the custody of MDOC for each of the first four counts charged in his indictment and to serve a term of five years in the custody of MDOC for Count V; with the sentence in Count I to run consecutively to the sentences in Counts II, III, and IV; with the sentence in Count III to run consecutively to the sentence in Count II; with the sentence in Count IV to run concurrently with the sentences in Counts II and III; and with the sentence in Count V to run concurrently with the sentences in Counts I, II, III, and IV.

¶ 17. On October 29, 2010, James filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial. On November 3, 2010, Roberson filed an amended motion for a JNOV or, in the alternative, a motion for a new trial, setting forth allegations that mirrored those in James's motion. In their motions, Defendants alleged that the trial court denied their right to a fair trial

4

by not removing Hattie Mae McLaurin (McLaurin)[1] and other jurors who failed to acknowledge during *voir dire* that they knew the family of the deceased victim. Defendants asserted that their right to a fair trial was also denied by the State's use of perjured testimony. In addition, Defendants claimed that the trial court erred by giving the State's defective accomplice jury instruction and that the State failed to prove its case beyond a reasonable doubt.

¶ 18. The trial judge entered an order on January 10, 2011, denying Defendants' motions. Defendants then filed a motion on January 28, 2011, for a rehearing and reconsideration of their motion for a JNOV or, in the alternative, a new trial. In the alternative, they filed a second motion for a new trial. Defendants based their motion on newly discovered evidence. An attached affidavit signed by Erica Barnes (Barnes), a juror in the case, stated that Barnes had worked at Wal–Mart with two daughters of Jessie, the victim killed in the armed robbery. The affidavit further stated that, upon recognizing the victim's daughters, Barnes was unable to remain fair and impartial during the trial. Barnes's affidavit also stated that she did not make the trial court aware of her inability to remain fair and impartial because she believed that it was too late to raise her concern once the trial began.

¶ 19. Defendants' motion was also accompanied by an affidavit signed by Roberson's attorney. This second affidavit stated that Barnes's husband had contacted the attorney and informed him that his wife, Barnes, had realized during the early stages of the trial that she knew some of the victim's family. Barnes's husband further informed the attorney that, because of this realization, Barnes determined that she could not be a fair juror in the trial. Following this conversation, Roberson's attorney sent his investigator to see Barnes around January 13, 2011, and to secure an affidavit from her.

¶ 20. On February 2, 2011, the trial judge entered an order denying Defendants' motion for reconsideration and their second motion for a new trial…

*James v. State*, 146 So. 3d 985, 987–91 (Miss. Ct. App. 2014).

On April 14, 2015, James filed his PCR motion and supported it with an affidavit executed by Love, recanting his trial testimony… The trial court held an evidentiary hearing on the motion, with Love being the only witness called to testify. Love testified that his original testimony during James's trial was not the truth. Love contended that his gang threatened him to "get [James and Roberson] off the street," which prompted him to perjure himself at James's trial. On November 18, 2015, the trial court denied James's PCR motion on the grounds that Love's testimony at trial corroborated other witness accounts… On appeal, James argues that Love's recanted testimony proved that perjury existed at his trial and that perjury was the material reason James was implicated in the crime.

*James v. State*, 220 So. 3d 989, 990-91 (Miss. Ct. App. 2016), *reh'g denied* (Apr. 11, 2017), *cert. denied*, 220 So. 3d 979 (Miss. 2017).

### *Procedural History*

Petitioner is in the custody of the Mississippi Department of Corrections (MDOC) at the Mississippi State Penitentiary, Parchman. Petitioner was convicted of the crimes of armed robbery (count one), manslaughter (count two), aggravated assault (count three), aggravated assault (count four), and conspiracy to commit armed robbery (count five) in the Attala County Circuit Court. *See* State Court Record ("SCR"), Cause No. 2011-KA–00210-COA, Vol. 1, p. 126-127. The circuit court sentenced Petitioner to serve a term of twenty (20) years in the custody of the MDOC for each of the first four counts and to serve a term of five (5) years in the custody of the MDOC for count five; with the sentence imposed in count one to run consecutively to the sentences imposed in counts two, three and four; with the sentence imposed in count three to run concurrently with the sentence in count two; with the sentence imposed in count four to run consecutively to the sentences imposed in counts two and three; and with the sentence imposed in count five to run concurrently with the sentences imposed in counts one, two, three, and four. *Id.* at 142.

Thereafter, Petitioner appealed his convictions and sentences to the Mississippi Court of Appeals, raising the following issues on appeal:

Issue One:    Whether the circuit court erred in denying James' theory of the case instruction;

Issue Two:    Whether the trial court erred in denying James' accomplice instruction, D-7;

Issue Three:    Whether the trial court erred in denying James' motion for new trial based on juror misconduct; and

Issue Four:    James adopts the issues raised on appeal by his co-defendant, Detrius Roberson, where not inconsistent with his objections and issues raised at trial and on appeal.

Doc. #1 at ¶4.

The Mississippi Court of Appeals affirmed the judgment of the circuit court in a written opinion. *James v. State*, 146 So. 3d 985 (Miss. Ct. App. 2014), *reh'g denied* June 17, 2014, *cert. denied* September 11, 2014 (Cause No. 2011-CT-00210-COA).

Petitioner then filed an application for post-conviction review in the Mississippi Supreme Court. Doc #9-6 at 28. Petitioner alleged that the State's main witness, Barry Love, had recanted his trial testimony and sought the Mississippi Supreme Court's permission to proceed with an evidentiary hearing in the circuit court. SCR, Cause No. 2015-M-00584. The Mississippi Supreme Court granted Petitioner's application. *Id* at 1.

As a result, Petitioner filed a motion for post-conviction relief in the Attala County Circuit Court, wherein he alleged that the State's main witness, Love, had recanted his trial testimony. Following the hearing, the circuit court denied Petitioner's motion for post-conviction collateral relief. *Id.* at 27-29; Vol. 2 (transcript of hearing).

Petitioner appealed the circuit court's denial of his post-conviction motion to the Mississippi Court of Appeals, raising the sole issue of whether the circuit court erred in denying James' motion for post-conviction collateral relief. The Mississippi Court of Appeals affirmed the circuit court's denial of his post-conviction motion. *See James v. State*, 220 So. 3d 989 (Miss. Ct. App. 2016), *reh'g denied* April 11, 2017, *cert. denied* June 29, 2017 (Cause No. 2015-CT-01822COA).

On November 30, 2017, Petitioner, filed an amended petition for Writ of *Habeas Corpus*[1] in this Court, pursuant to 28 U.S.C § 2254, raising the following grounds for relief:

---

[1] Petitioner filed his initial petition for Writ of *Habeas Corpus* in this Court in September 2017. Doc. #1.

Ground One:   Whether the circuit court erred in denying his theory of
the case instruction;

Ground Two:   Whether the trial court erred in denying his accomplice
instruction, D-7;

Ground Three:  Whether the trial court erred in denying his motion for
new trial based on jury misconduct; and

Ground Four:  Whether the trial court erred in denying the Petitioner's
motion for post-conviction collateral relief based
on the recanted testimony of the state's main material
fact witness, co-defendant Barry Love.

Doc. #4 at 3.

The State then responded, attaching the state court record, on March 12, 2018. Doc. #8-9.

On May 6, 2018, Petitioner filed a traverse. Doc. #10.

### *Legal Standards*

### *Evidentiary Hearing*

United States Code Section 2254(e)(2) "curtails [federal] evidentiary hearings," *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997), and shifts the focus of hearings to state court where it belongs. *Hernandez v. Johnson*, 108 F.3d 554, 558 (5th Cir. 1997).

The United States Supreme Court has enumerated only six circumstances in which an evidentiary hearing would be required:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the Habeas applicant a full and fair fact hearing.

*Jefferson v. Upton*, 560 U.S. 284, 290 (2010)(citation omitted). Essentially, as the Fifth Circuit has recently opined:

> Where the facts are in dispute, the federal court in Habeas Corpus must hold an evidentiary hearing if the Habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*United States v. Batamula*, 823 F.3d 237, 248 (5th Cir. 2016).

### *Habeas Standard and Limitations on Review*

This and all other federal courts hold only limited jurisdiction with respect to matters, particularly criminal matters, of state law, especially those that have been previously adjudicated on the merits. Further, on review, federal courts are bound by a state's interpretations of its own laws. *Estelle v. McGuire,* 502 U.S. 62, 68 (1991); *Rosales v. Dretke,* 444 F.3d 703, 707 (5th Cir.2006) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)). As such, only errors of federal law can support intervention in state proceedings. *Oxborrow v. Eikenberry,* 877 F.2d 1395, 1400 (9th Cir.1989). Therefore, this Court may consider an application for relief in the form of a Writ of *Habeas Corpus* on behalf of a person in the custody of the State, pursuant to the judgement of a state court, only if the prisoner is in custody in violation of the Constitution or laws or treatises of the United States. 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, revised federal *habeas corpus* legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996[2] and applies to *habeas* petitions filed after that date. *Flanagan v. Johnson,* 154 F.3d 196, 198 (5th Cir.1998) (citing *Lindh v. Murphy,* 521 U.S. 320

---

[2] The AEDPA was signed into law on April 24, 1996. However, it does not specify an effective date for its non-capital habeas corpus amendments. In these instances, absent a provision to the contrary, statutes become effective upon enactment, the moment they are signed into law. *United States v. Sherrod,* 964 F.2d 1501, 1505 (5th Cir.1992).

(1997)). The AEDPA therefore applies to James' petition, which was filed in this federal court on August 25, 2017.[3]

Pursuant to 28 U.S.C. § 2254(d), this application for a Writ of *Habeas Corpus* shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The exception in Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

A decision is "*contrary* to" clearly established federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

As for the "*unreasonable* application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001).

> Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle

---

[3] *Morrison v. Cain*, No. CIV.A. 06-10704, 2007 WL 4114345, at n.27 (E.D. La. Nov. 16, 2007).

10

to a new context where it should apply." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; accord *Penry*, 532 U.S. at 793.

*Demus v. Davis*, No. 3:15-CV-1723-M (BH), 2017 WL 2266935, at 4 (N.D. Tex. Apr. 3, 2017), *report and recommendation adopted,* No. 3:15-CV-1723-M, 2017 WL 2271436 (N.D. Tex. May 22, 2017), *reconsideration denied,* No. 3:15-CV-1723-M, 2017 WL 3016841 (N.D. Tex. July 14, 2017).

Further, 28 U.S.C. § 2254(d)(1) restricts the source of "clearly established" law to the Supreme Court's jurisprudence.

> "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to the holdings… of the Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003).

*Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1000 (N.D. Cal. 2016), *certificate of appealability denied* (Nov. 7, 2016).

Finally,

> Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.' " *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

*Demus*, No. 3:15-CV-1723-M (BH), 2017 WL 2266935, at 4.[4]

---

[4] It is the petitioner's burden to prove that the state appellate courts have determined the facts unreasonably, and he must do so with clear and convincing evidence. *Miller v. Denmark*, No. 3:14CV196-MPM-RP, 2017 WL 3897167,

11

<u>*Analysis*</u>

### *1. Ripeness*

The threshold questions upon *habeas* review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson,* 127 F.3d 409, 419-20 (5th Cir.1997) (citing 28 U.S.C. § 2254(b), (c)).

Upon review of the record, the Court finds that James' petition is timely filed, and Respondent concedes that Petitioner has exhausted his state court remedies as to the issues raised in the instant petition.

### *2. Evidentiary Hearing*

Upon review of the record, it is the opinion of the undersigned that an evidentiary hearing is not necessary. As evidenced by the procedural record outlined above and the undersigned's finding's below, the state-court trier of fact both afforded Petitioner a full and fair hearing and reliably found the relevant facts.

### *3. Grounds One and Two: The Instruction Grounds*

Upon Grounds One and Two, Petitioner alleges that the circuit court erred in refusing to give both his theory-of-the-case instruction and his accomplice instruction.

**Law**

---

at 3 (N.D. Miss. Sept. 6, 2017)(citing *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000)); 28 U.S.C. § 2254(e)(1).

Grounds alleging incorrect, erroneous, or omitted (as here) jury instructions present questions of law[5] or mixed questions of law and fact. Under the AEDPA, questions of law are governed by § 2254(d)(1) which states that a district court may not grant a petition challenging a state conviction on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Regarding challenges to refused jury instructions, the Supreme Court has clearly established that unless a district court finds that an improper instruction rose to the level of a constitutional violation, habeas corpus will not lie to set aside the conviction. *Estelle v. McGuire*, 502 U.S. 62 (1991). [6] In order to prevail in establishing that the refusal to give the jury instruction rose to the level of a constitutional violation, "[a] petitioner must show that the erroneous instruction by itself [or the refusal to give a requested instruction] so infected the entire trial that the resulting conviction violates due process."[7] *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009). [8] Further, "it is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)(citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

---

[5] *United States v. McGeshick*, 41 F.3d 419, 421 (9th Cir. 1994); *Keith v. Ratelle*, 162 F.3d 1168 (9th Cir. 1998).

[6] *Cupp v. Naughten,* 414 U.S. 141, 147 (1973); see also *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

[7] "And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid.*" *Estelle v. McGuire*, 502 U.S. 62, 72–73 (1991).

[8] *Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1006 (N.D. Cal. 2016), *certificate of appealability denied* (Nov. 7, 2016 (But a habeas petitioner whose claim involves the failure of a state court to give a particular instruction, as opposed to a claim that the court gave an incorrect instruction, bears an "especially heavy burden.")

**Ground One: Whether the State Court Erred in Refusing to Give Petitioner's Theory of the Case Instruction**

The state appellate court rendered a lengthy discussion detailing why the proposed "theory of the case" jury instruction was not warranted in Petitioner's case, according to Mississippi law. *James,* 146 So. 3d at 991-95. Specifically, the court stated, in part:

> **III. Whether the trial court erred by refusing James's jury instruction as to his theory of the case.**
>
> James argues that the trial court erred by refusing his theory-of-the-case instruction, which told the jury that James's "theory of the case is that at the time of the incident in question he was with Keshia Windom[,] and if you so find[,] you must find ... James not guilty."…
>
> ¶ 36. As previously noted, this Court will not reverse the trial court's refusal of a requested instruction where the jury was fairly, fully, and accurately instructed as to the applicable law. *See Holmes,* 754 So.2d at 537 (¶¶ 20–21) (citation omitted). Reading all the given jury instructions together, we find that jury instruction 7 adequately covered James's theory of his case. Because James's proposed theory-of-the-case instruction was redundant, the trial court did not err by refusing it. Therefore, this issue lacks merit.

*James v. State*, 146 So. 3d 985, 994-95 (Miss. Ct. App. 2014). Jury Instruction Number 7, displayed below, read as follows:

14

INSTRUCTION NO. ____1____

"Alibi" means elsewhere or in another place. In this case, the defendant is asserting the defense of alibi by saying at the time of the alleged incidents at the Hills Brother Shop the defendant was with Keshia Windom..

"Alibi" is a legal and proper defense in law. The defendant is not required to establish the truth of the alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the defendant was present and committed the crime, then you must give the defendant the benefit of any reasonable doubt and find the defendant not guilty.

Doc. #9-7 at 102.

In the instant petition, Petitioner contends that his "theory of the case" instruction was supported by the evidence, and therefore, should have been given, as it was an instruction pertaining to his defense. Doc. #10 at 5. He further argues that the failure to do so is not harmless error. *Id.*

Respondent argues that, generally, challenges to *erroneous* jury instructions may not form a basis for federal *habeas corpus* relief because a petitioner must prove that the improper instruction so infected the entire trial that Petitioner's rights were violated resulting in a constitutional violation. Respondent further argues that, similarly, *refusal* to give an instruction

15

must rise to the level of a constitutional violation to give rise to *habeas* relief as well. Respondent argues that this is a very high burden that Petitioner cannot meet.

Upon review of the record, and the jury instructions as a whole, it is clear that the trial court did in fact fully, fairly, and adequately instruct the jury on the applicable law and the Petitioner's theory. In fact, the court fully conveyed the Petitioner's proposed Jury Instruction Number 7, displayed above. Therefore, the undersigned sees no basis upon which the Petitioner could claim that the rejection of the instruction infected the trial in any way much less to the extent that the refusal would rise to the level of a violation of due process or any other constitutional right.[9]

### Ground Two: Whether the State Court Erred in Refusing to Give Petitioner's Accomplice Instruction

The state appellate court found the following regarding the refused accomplice instruction, in part:

> **II. Whether the trial court erred by refusing Defendants' jury instruction as to accomplice testimony.**
> As explained by *Williams,* the jury must be instructed to view the testimony of a co-conspirator with great caution and suspicion in cases where the co-conspirator testimony is the sole basis for the conviction. *Id.* at 490 (¶ 12). In the case before us, however, the record reflects that Defendants' convictions are supported by more evidence than just the testimony of Love, the co-conspirator. As previously noted, the State argues that Love's testimony tying Defendants to the robbery was corroborated by other evidence admitted during trial. Specifically, the State points to Defendants' phone records, the eyewitness testimony of Holt and Regina asserting that they saw a white Cadillac parked on a nearby road prior to the shooting, and the discovery of an unspent 9–millimeter round in James's car after the shooting. Since the record provides evidence corroborating Love's testimony, we find that the trial court was not required to instruct the jury to regard Love's testimony with great caution and suspicion. *See id*. Therefore, this issue lacks merit.

---

[9] In fact, the Supreme Court made a parallel finding in *Henderson v. Kibbe*, wherein it stated that it was not "constitutional error" for a trial court to refuse a defendant's proposed instruction where the jury instructions given where adequate, as here, even where the proposed instruction would not have been cumulative. *Henderson v. Kibbe*, 431 U.S. 145 (1977).

*James v. State*, 146 So. 3d 985, 993–95 (Miss. Ct. App. 2014).

Petitioner argues that accomplice instructions are generally approved and given to the jury as, "they represent no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity." Doc. #10 at ¶5.

Respondent reasserts its arguments against Ground One, above.

The Petitioner's argument that the instruction should have been approved because accomplice instructions generally are is conclusory and lacks merit. As the appellate court stated, the Petitioner was not convicted solely on the testimony of the accomplice, Love. His involvement was corroborated variously, as stated above.[10] Therefore, accomplice testimony encouraging suspicion was not required. Moreover, the court does note that the trial court did in fact give an instruction on accomplice testimony nevertheless.[11] Again, in light of the facts and the jury instructions as a whole, it is clear that, not only was the Petitioner given due process, but the instruction he complains that he did not receive was given, albeit in a shortened state.

Therefore, the undersigned finds that the appellate court rendered a fair and accurate decision, in accordance with clearly established Supreme Court precedent. As the appellate court's application of the law and corresponding decision was not error, it could not have so infected the entire trial that the resulting conviction violated due process or any other constitutional violation.

---

[10] *Bond v. King*, No. 1:11-CV-241-HSO-JMR, 2013 WL 3190221, at 7 (S.D. Miss. June 20, 2013)("Under Mississippi law, "[t]he uncorroborated testimony of an accomplice may be sufficient to convict an accused ..." *Ballenger v. State,* 667 So.2d 1242, 1253 (Miss. 1995) (citation omitted). Only slight corroboration of an accomplice's testimony is required to sustain a conviction. *Mangum v. State,* 762 So.2d 337, 342 (Miss. 2000). The testimony that must be corroborated is the part connecting the defendant to the crime. *Holmes v. State,* 481 So.2d 319, 322 (Miss. 1985). As discussed above, the state court found sufficient evidence to support Bond's conviction, based on all the evidence presented, not just Young's testimony. The Court finds no basis for *habeas* relief based on Bond's contentions concerning the denied jury instruction.")

[11] "The Court instructs the Jury that Barry Love is an accomplice in this case and the testimony of an accomplice is to be considered and weighed with great care and caution. You may give it such weight and credit as you deem it is entitled." Doc. #9-7 at 99.

17

**Ground Three: Whether the State Court Erred in Denying Petitioner's Motion for New Trial Based on Juror Misconduct**

Petitioner argues that the circuit court erred in denying his motion for new trial based on juror misconduct. His allegations of juror misconduct consist of the following actions: (1) witnesses' and a juror's alleged inappropriate eye contact during the trial with the family of Jessie Hill, a victim in the underlying case; and (2) the failure of several jurors to disclose during *voir dire* a relationship with members of Hill's family. During the trial, defense counsel brought these incidences of alleged juror misconduct to the circuit court's attention. SCR, 2011-KA-00210-COA, Vol. 6, p. 593.

First, the mother of Petitioner's co-defendant, Detrius Roberson, alleged that she saw witnesses making eye contact with the victim's family in the audience and with jurors. *Id.* at 594. Roberson's mother also observed that members of the Hill family in the audience were looking at witnesses, jurors, and prosecutors. *Id.* at 594-95. When the prosecutor questioned Roberson's mother as to why she thought it was wrong or inappropriate for jurors, witnesses, audience members, and the prosecution to look at one another during trial, Roberson's mother replied, "Oh, I don't know. I don't know what's the problem. I really don't." *Id.* at 597-98.

In addition to Roberson's mother's testimony, Petitioner's brother also testified that he saw a female juror, while walking from the jury room into the courtroom, shaking her head or bobbing her head affirmatively and looking "under her eyes" in the direction of the audience where the Hill family was seated. *Id.* at 598-600; SCR, 2011-KA-00210-COA, Vol. 7, p. 601-03. Following this testimony, the prosecution noted the following for the record:

18

> The jury door actually faces toward the audience. And . . . when they [(the jurors)] come out of the . . . jury room, . . . they face directly into the audience. And then the jury box is right here to their left, where they have to navigate upstairs. And there [are] two rows, and they have to go between the chairs to get to their seats while walking toward the – what they are claiming is where the Hill family was sitting, that you had to walk in that direction.

SCR, 2011-KA-00210-COA, Vol. 7, p. 603-04. Defense counsel moved for this particular juror—accused by Roberson's brother—to be removed from the jury and replaced with an alternate. *Id.* at 604. The circuit court denied this request, finding that no evidence of juror misconduct existed. *Id.* This court is similarly unpersuaded that the asserted offensive conduct constitutes juror misconduct.

The Supreme Court has opined regarding motions for a new trial based on juror misconduct:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable… Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing… Of equal importance, this case is a federal habeas action in which [the appellate court's] findings are presumptively correct under 28 U.S.C. § 2254(d). We held last Term that federal courts in such proceedings must not disturb the findings of state courts unless the federal habeas court articulates some basis for disarming such findings of the statutory presumption that they are correct and may be overcome only by convincing evidence. *Sumner v. Mata*, 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).

*Smith v. Phillips*, 455 U.S. 209, 217-18 (1982).

Aside from pure speculation and conjecture, there is—on its face—no basis, let alone clear and convincing evidence, upon which to find that the juror was incapable or unwilling to decide the case solely on the evidence before her, such that the undersigned would be moved to disturb the finding of the state court, as it is presumed to be correct.

Petitioner's additional argument regarding juror misconduct rests upon his allegation that several jurors failed to disclose, during *voir dire*, a relationship with members of Hill's family.

Petitioner first takes issue with Juror Hattie Mae McLaurin. During *voir dire*, the prosecution asked the following question: "Does anybody know the Hill family or [is anybody] friends with the Hill family?" SCR, 2011-KA-00210-COA, Vol. 3, p. 123. McLaurin responded that she was a friend of the Hill family but stated that there was nothing about the relationship that would cause her to be unfair or partial. *Id.* at 124. At the hearing on James' motion for JNOV, or in the alternative, a new trial, the circuit court noted that the defense failed to ask any follow-up questions regarding McLaurin's statement. SCR, 2011-KA-00210-COA, Vol. 9, p. 816-17. As a result, the circuit court appropriately refused to let the defense call McLaurin as a witness at the hearing.[12] *Id.* at 817.

James also references other jurors whom he claims failed to disclose during *voir dire* a relationship with members of Hill's family: Jeanell Jamison, James Hughes, Erica Barnes, and Betty Weatherby. At the hearing on the JNOV motion, all four (4) jurors testified that they "knew of" the Hill family but had *no personal relationship* with them. The Respondent suggests, and the undersigned finds persuasive, that it is plain from their testimony that these four (4) jurors considered the questions posed during *voir dire* about who knew or had a relationship with the Hill family to be ambiguous.

For example, Juror Jamison testified at the hearing that she worked at the same elementary

---

[12] In its Order denying JNOV, the circuit court also explained that it did not permit the defense to call Juror Sheree Armstead at the hearing for similar reasons. SCR, 2011-KA-00210-COA, Vol. 2, p. 177; Vol. 4, p. 158; Vol. 9, p. 941-44.

school where Hill's sister and daughter worked. *Id.* at 895-900. However, Jamison worked in the school's cafeteria and the victim's relatives worked as teachers. *Id.* at 822, 895-900. Jamison testified that the teachers did not usually accompany their students into the cafeteria for lunch because that job belonged to their assistants. *Id.* at 899, 905. As such, they had very little contact at the school. *Id.* at 821-22, 830, 903. Jamison maintained that her reason for not indicating during *voir dire* that she knew of the Hill family was that she believed that the aim of the questions was to determine who personally knew the Hill family and that she did not personally know them–just knew of them. *Id.* at 903, 904, 906, 910, 911.

Another juror, Erica Barnes, testified at the hearing that at some point, she and two of Hill's daughters had worked at the same Wal-Mart. *Id.* at 945-47. However, Barnes testified at the hearing that she did not "conversate" with them and she was clear that she did not know them personally. *Id.* at 945, 947-49, 951. Juror Barnes testified that she did not respond to the questions about knowing the Hill family in *voir dire* because "I thought he was talking about personally." *Id.* at 949.[13]

---

[13] Despite this sworn testimony, the defense subsequently obtained an affidavit allegedly signed by Juror Barnes one week after the hearing claiming that she was unable to be fair and impartial once she realized that she knew the victim's daughters. SCR, 2011-KA-00210COA, Vol. 2, p. 189. The affidavit further alleges that she believed it was too late to raise that concern once trial started. *Id.* In its Order denying James' motion for reconsideration, the circuit court opined, "To say that the present affidavit is suspect is a gross understatement." *Id.* at 191("Barnes testified at the first motion for a new trial and was adamant that she had no more than a passing relationship with the Hill. She neglected to use that opportunity to inform the Court of her inability to be fair and impartial. The Court, having had the opportunity to observe Barnes' testimony and review a transcript of the same, finds the present affidavit to be inconsistent with her prior testimony" Further, the circuit court judge explained: "Regardless, Rule 606(b) MRE together with case law prohibits this Court from considering the affidavit. Rule 606(b) says: 'Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberation or the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental process in connection therewith.").

Jurors Hughes and Weatherby also testified during the hearing that they knew of the Hill family but did not know any of the family members personally. *Id.* at 936, 938, 954, 957. The undersigned finds persuasive the trial court's finding that the questions during *voir dire* about the jurors' knowing or having relationships with persons involved in the crime or victims thereof to have been ambiguous when questioning certain jurors. This circumstance is understandable given even the prosecutor's variously referencing the concepts of "knowing," "relationships," and "friendships" seemingly interchangeably. For example, just prior to asking about the Hill family during *voir dire*, the prosecutor explained:

```
        MR. WHITFIELD:  Yes, sir.
     Now, during this trial, the judge has already
touched on whether you are related by blood or marriage
to several individuals.  Now we are going to ask if you
know these individuals or have a friendship with these
individuals.
     Does anybody have a friendship or relationship with
Randy Blakely?  He is going to be a deputy sheriff
```

Doc. #9-9 at 134.

On direct appeal, the Mississippi Court of Appeals considered Petitioner's allegations regarding any potential juror misconduct and held:

> Case law provides that if a potential juror fails to answer a question asked during *voir dire*, then the trial court should determine whether the question asked was "(1) relevant to the *voir dire* examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978). If the answers to these three questions are affirmative, then the trial court should determine if prejudice to the defendant could be inferred due to the juror's failure to respond. Where prejudice can be reasonably inferred, the trial court should order a new trial. "It is, of course, a judicial question as to whether a jury is fair and impartial, and

22

the trial court's judgment will not be disturbed unless it appears clearly that it is wrong."

*James v. State*, 146 So. 3d 985, 998 (Miss. Ct. App. 2014) (internal citations omitted). The *Odom* case cited by the state court tracks the Supreme Court's language in *McDonough, infra*.

United States Supreme Court precedence dictates that prospective jurors are presumed to be impartial and able to render a verdict based on the evidence presented in court. *Willie v. Maggio*, 737 F.2d 1372, 1379 (5th Cir. 1984)(citing *Irvin v. Dowd*, 366 U.S. 717, 719 (1961)). In order to succeed on a claim of juror bias, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

The question posed during *voir dire* in this case was undoubtedly ambiguous. As previously discussed, all four jurors who testified during the hearing stated that they believed the *voir dire* question was intended to discover who might personally know the Hill family or have an actual relationship with the family. Having interpreted the question to the best of their ability, each of the jurors stated they did not personally know a member of the Hill family but merely knew of the Hill family. *James*, 146 So. 3d at 998 (internal footnote omitted). The undersigned is not persuaded that their responses during *voir dire* were an attempt to deceive the court, but instead were honest responses to what they understood the question to concern. Upon review of the jurors' testimonies and for the reasons stated above, the undersigned is persuaded that the jurors did in fact honestly answer this question on *voir dire*, and as such, it has not demonstrated juror bias based thereon.

23

Moreover, the trial court's decision was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Even further, state appellate courts are presumed to have determined the facts correctly, *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1), and it is plain that Petitioner has not established, with clear and convincing evidence, that this finding resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. As such, the undersigned no reason to disturb the decision of the state court.

**Ground Four: Whether the Trial Court Erred in Denying the Petitioner's Motion for Post-Conviction Collateral Relief Based on The Recanted Testimony of the State's Main Material Fact Witness, Co-Defendant Barry Love.**

Petitioner argues that the circuit court erred in denying his motion for post-conviction collateral relief based on the recanted testimony of the state's main material fact witness, co-defendant Barry Love. As explained herein, this argument is not supported by the record or common sense.

In his state court post-conviction motion, Petitioner alleges that Love recanted the incriminating testimony that he had previously given against him and attached an affidavit to that effect. *See* SCR, Cause No. 2015M-00584. The Mississippi Supreme Court granted Petitioner permission to proceed with his motion, and the Attala County Circuit Court held a hearing on the issue of Loves' alleged recanted testimony. Love was the only witness called to testify. *See* SCR, Cause No. 2015-CA-01822-COA, Vol. 2 (transcript of hearing).

24

At the hearing, Love testified that his original testimony during Petitioner' trial was not the truth. *Id.* at 5. Instead, Love contended that his own gang threatened him to get Petitioner, who was a member of a different gang, off of the streets. This, according to Love's new testimony, prompted Love to set up Petitioner as being a participant in the commission of criminal offenses actually committed only by Love and others, but for which, according to the plan, Love and petitioner would both be arrested. As a co- defendant, Love reasoned, he would be able to testify that Petitioner was, in fact, present with him for the commission of the crime(s) charged. *Id.* at 6. Love admitted at the hearing on the recanted testimony that he, as he had testified at Petitioner's trial, went to the scene of the subject crime in a white Cadillac. However, at the trial, he testified that the white Cadillac was owned by Petitioner. In his new testimony, he declared the white Cadillac was not Petitioner's. *Id.* at 8-9. It was just one gotten to look like Petitioner's Cadillac as part of the plan to set up the Petitioner. *Id.* at 11. Love testified further at the hearing that there were actually only *three* perpetrators – himself, Robert Landfair (who had previously pleaded guilty to crime(s) associated with the armed robbery at issue), and Derrick Manning, who allegedly was since deceased. *Id.* at 8-9, 14. He explained that his prior testimony—to the effect that in addition to the Petitioner, another person, Detrius Roberson, was also a participant in the crime—had been a lie too, and that he (Love ) had just thrown Roberson's name in in order to try to get him off the street too. *Id.* at 10. Because at the trial Petitioner's and Roberson's cell phones were demonstrated by cell tower records to have been utilized in the area where the subject crimes were committed at approximately the time of the crimes, Love further newly testified that that too was all part of the set up. Specifically, he explained that Petitioner's and Roberson's cell phones were somehow taken from them before commission of the crimes and phone calls were made

from the phones by the crime participants as part of the set up. Love could not explain how it was

that the Petitioner and Roberson had their cell phones on them when arrested other than to offer,

"So, I guess everything fell like orchestrated, I guess." *Id*. at 15.

After hearing Love's testimony, the circuit court set out its reasons for discrediting Loves'

recantation and denied James' PCR motion, providing, in part:

> Decisions of the Mississippi Supreme Court hold that recanted testimony is
> "exceedingly unreliable, and is regarded with suspicion, and it is the right and duty
> of the court to deny a new trial where it is not satisfied that such testimony is not
> true." *Bradley v. State*, 214 So. 2d 815 [(Miss. 1968)]; *Yarborough v. State*, 514
> So. 2d 1215 [(Miss. 1987)]. The Court finds the trial testimony of Barry Love to
> be sufficiently corroborated by other witnesses and the cell phone records
> produced at trial and that his recanted testimony is uncorroborated. The Court finds
> the recanted testimony to be totally fabricated and not true. The Motion for Post-
> Conviction Relief seeking a new trial based on this testimony is denied.

SCR, Cause No. 2015-CA-01822-COA, Vol. 1, p. 27-29. The Mississippi Court of Appeals

affirmed in *James v. State*, 220 So. 3d 989, 991 (Miss. Ct. App. 2016), *reh'g denied* April 11,

2017, *cert. denied*, June 29, 2017, finding that James failed to prove that Loves' recantation

entitled him to a new trial. In making its decision, the state appellate court acknowledged the

circuit court's findings that Loves' recantation was a total fabrication and that Loves' testimony

at trial corroborated the State's evidence against James. *Id.*

The circuit court's findings of fact and credibility determinations are presumed correct.

28 U.S.C.A. § 2254(e)(1); *Dale v. Quarterman,* 553 F.3d 876, 879 (5th Cir. 2008). "The

presumption is especially strong when the state habeas court and the trial court are one in the

same." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

Other than Petitioner's fanciful and frankly unpersuasive affidavit from his co-defendant,

Love, Petitioner offers no evidence that would rebut the presumption that the trial court's findings

are correct or support a finding contrary to that of the circuit court. The Supreme Court has clearly established that, "[r]ecantation testimony is properly viewed with great suspicion… [as such testimony] upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984).

Based on the foregoing, the state court's holding was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Further, it is plain that Petitioner has not established, by clear and convincing evidence, that those facts to which the state appellate courts applied the law were determined unreasonably in light of the evidence presented. Therefore, Petitioner has failed to demonstrate that he is entitled to federal habeas relief with regard to his claim in Ground Four of his petition.

### *Conclusion*

Upon a review of the state court's findings regarding Petitioner's allegations as discussed above, the state court's determination that Petitioner was not entitled to relief did not "result[ ] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" *See* 28 U.S.C. § 2254(d)(1). Furthermore, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d)(2). For the foregoing reasons, the undersigned recommends that the petition for writ of *habeas corpus* be DENIED.

### *Recommendation*

27

The undersigned therefore **RECOMMENDS** that the petition of Justin "Hurricane" James for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED.**

### *Procedure for Objections*

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within (14) fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).

**SO RECOMMENDED** this, the 14th day of August, 2018.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**

28